Rev. 6/03

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Pro se [Non-prisoner] Complaint Form

FILED ♦
SEP 2 4 2012
IN THIS OFFICE
Clerk U. S. District Court
Greensboro, N. C.
By _____

| | |
|---|---|
| ANDREA C. WEATHERS | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| UNIVERSITY OF NORTH | ) |
| CAROLINA AT CHAPEL HILL; | ) |
| HERBERT B. PETERSON, | ) |
| in his individual and official capacity; | ) |
| JONATHAN KOTCH, | ) |
| in his individual and official capacity; | ) |
| BARBARA K. RIMER, | ) |
| in her individual and official capacity; | ) |
| EDWARD M. FOSTER, | |
| in his individual and official capacity; | |
| and | |
| SANDRA L. MARTIN, | |
| in her individual and official capacity. | |

Civil Action No. 1:12CV1059
(to be assigned by the Clerk)

_____
                    **Defendants.**

## COMPLAINT

### I.    JURISDICTION

This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§1331, 1343, 1345, and 1391; 42 U.S.C. §2000e-5(f); 42 U.S.C. §1981; and 42 U.S.C. §1983.

This Court has personal jurisdiction over Defendants UNC-CH, Peterson, Kotch, Rimer, and

Martin—who each reside within the Middle District of North Carolina. This Court has personal

jurisdiction over Defendant Foster, who now resides in the state of Alabama, both because he

1

was a party in the original complaint, and based upon "minimum contacts"—because the claim

against him arises out of his actions while in the state of North Carolina.

Venue is proper in the United States District Court for the Middle District of North Carolina

pursuant to 28 U.S.C. §1391(b) and (c) in that at least one Defendant resides in this judicial

district and a substantial part of the events or omissions giving rise to the claims occurred within

this judicial district.

---

## II.     PARTIES

A.  Plaintiff

      Andrea C. Weathers

      105 Scottingham Lane

      Morrisville, North Carolina 27560

B.     Defendants

**Mrs. Leslie Strohm**

University of North Carolina at Chapel Hill

Vice Chancellor and General Counsel

110 Bynum Hall, CB #9105

222 E. Cameron Ave.

Chapel Hill, NC 27599-9105

**Herbert B. Peterson**

105 Possum Place

Chapel Hill 27516-9037

2

**Jonathan Kotch**

UNC Gillings School of Global Public Health

Department of Maternal and Child Health

428 Rosenau Hall, Campus Box 7445

135 Dauer Drive

Chapel Hill 27599-7445

**Barbara K. Rimer**

Dean's Office

UNC Gillings School of Global Public Health

170 Rosenau Hall, Campus Box 7400

135 Dauer Drive

Chapel Hill 27599-7400

**Edward M. Foster**

University of Alabama at Birmingham

School of Public Health

Ryals Public Health Building, 330K

1665 University Boulevard

Birmingham, Alabama 35294-0022

3

**Sandra L. Martin**

UNC Gillings School of Global Public Health

Department of Maternal and Child Health

422-D Rosenau Hall, Campus Box 7445

135 Dauer Drive

Chapel Hill 27599-7445

C.     Additional Defendants

No additional defendants

## III.     STATEMENT OF CLAIM

### INTRODUCTION

*The real voyage of discovery consists not in seeking new landscapes*

*but in having new eyes. –**Marcel Proust***

1.     The purpose of this complaint is to provide information to support my pro se petition to
the United States District Court for the Middle District of North Carolina (USDCNC), under the
Federal Rules of Civil Procedure Rules 60 (d) and 60 (b) (6), wherein I request: 1) that the
summary judgment ruling in favor of the defendants in my prior case before the USDCNC be
vacated, and 2) that I be allowed to proceed to a trial by a jury of my peers. Because the
judgment and order that I desire to have vacated were issued by the USDCMC—a federal court,
it is proper for this complaint to be made in the federal, rather than the state, court system. The
basis upon which I make these requests is the recent uncovering of fraud upon the USDCNC by
the defendants in my earlier legal suit [1:08-CV-00847 in the USDCNC]. The action in my prior
legal suit was brought under the Civil Rights Act of 1866, as amended by Section 101 of the
Civil Rights Act of 1991, codified in 42 U.S.C. §1981 ("Section 1981"); 42 U.SC. §1983 of the

4

Civil Rights Act of 1871 (Section 1983); violation of civil rights under Title VII of the Civil Rights Act of 1964 as amended, codified in 42 U.S.C. § 2000e et. seq; and violation of due process under the U.S. and North Carolina Constitutions for injunctive relief, compensatory damages and punitive damages arising from the terms and conditions of employment imposed by Defendants on Plaintiff, an African American female.

2.      Two objectives guide this complaint. The first objective is to examine the fraud committed upon the court by the defendants. The second objective is to discuss my qualifications for promotion and tenure. The intent of the second objective is to demonstrate how the fraudulent action of the defendants compromised the judicial decision-making process, and functioned to misinform and mislead the finder of fact in the USDCNC, and ultimately I believe, resulted in both an improper ruling and an improper denial of my right to a trial by jury, as guaranteed under the 7th amendment to the U.S. Constitution. Preceding discussion of these two objectives is a summary of the facts and the bases upon which the district court supported summary judgment in favor of the defendants.

**FACTS**

3.      In its Memorandum Opinion and Order of November 18, 2010, the USCNC awarded summary judgment in favor of the defendants, after concluding that Dr. Weathers failed to establish three elements of a prima facie case of employment discrimination, as set out in Alvarado. Based upon its analysis, the USDCNC concluded that Dr. Weathers had not:

1) applied for tenure,

2) presented evidence that she was qualified for promotion and tenure, and

3) presented evidence that she was rejected under circumstances giving rise to an inference of unlawful discrimination.

5

Key to the USDCNC's determination that the defendants had not discriminated against Dr. Weathers was the court's acceptance of the defendants' testimony that no official process or procedures for faculty promotion existed in the department of Maternal and Child Health (MCH). Absent the existence of an official process for faculty promotion in MCH, the defendants could then argue that Dr. Weathers had neither been discriminated against nor had she received disparate treatment, as compared to other faculty in MCH, with regards to the process used within MCH for development and submission of application packages for promotion and tenure. The USDCNC further accepted the defendants' assertions that Dr. Weathers had been offered "repeated" assistance from Dr. Peterson and Ms. Cotcamp towards completion of her promotion package, as well as "substantial efforts" of help towards attaining tenure from Dr. Peterson, the MCH department, the School of Public Health, and the University [University of North Carolina at Chapel Hill (UNC)]. In support of this testimony, the defendants argued, in their September 3, 2010 Reply to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, against the validity and materiality of a 1996 document found by Ms. Cotcamp. This document (RRPFP 1996) outlined a formal process within the MCH department for supporting and guiding faculty members seeking tenure. Specifically, the defendants state that "there is no evidence that it [the RRPFP 1996 document] ever had any official status in MCH, that the procedures described therein were ever followed or that Weathers would have complied with the procedures if they had been policy."(p.3) Moreover, the reply states that "Peterson did testify that he never implemented procedures and does not know if they ever were implemented in MCH." (p.2). Dr. Peterson testified that he had no recollection of the document—despite being presented with written evidence from the record, as well as despite direct testimony from Ms. Cotcamp, while under oath during her deposition,

6

that he (Dr. Peterson) had instructed Ms. Cotcamp to not show Dr. Weathers the "promotion policy". Despite the evidence of the RRPFP 1996 document itself, the testimony of Ms. Cotcamp, and Dr. Peterson's inability to remember—but not denial of—his instructions to Ms. Cotcamp, the USDCNC accepted the defendants' testimony that the RRPFP 1996 was not an official document, that no official process was used to guide faculty seeking promotion and tenure in MCH, and therefore that Dr. weathers had not received disparate treatment during the promotion application process. As a result, the USDCNC concluded: 1) that Dr. Weathers had not been discriminated against during the application process, 2) that Dr. Weathers was solely to blame for submitting an untimely promotion package, and 3) that she did not apply for tenure. Dr. Weathers then made a timely appeal to the U.S. Court of Appeals for the 4th Circuit. The judgment of the USDCNC was upheld by the 4th Circuit Court of Appeals in its decision entered 9/29/2011. Dr. Weathers' timely request for a rehearing also was denied [Order filed 10/31/2011 and Mandate filed 11/08/2011]. Dr. Weathers then sought the assistance of new counsel to assist her in an appeal to the U.S. Supreme Court.

### MEMO 1996

4.      While preparing to appeal her case upon certiorari to the U.S. Supreme Court, Dr. Weathers unexpectedly discovered two documents that provide evidence that the defendants committed fraud upon the court. The documents were in an old file folder, which contained numerous old emails and two previous incorrect versions of reappointment letters that were sent in early 2004 from Dr. Kotch to Dr. Weathers. Because both of these letters contained errors, Dr. Weathers never relied upon either for her reappointment. Upon bringing the errors in the first reappointment letter (see Exhibit A) to the attention of Dr. Kotch and Mrs. Bowers, Dr. Weathers was told by Mrs. Bowers that the letter was a "cut-and-paste" copy of a letter than had recently

7

been sent to another faculty member, and that it had been sent to her [Dr. Weathers] by mistake. She asked Dr. Weathers to destroy the letter and the information sent to her, and told Dr. Weathers that she would be issued a new letter. Dr. Weathers then filed the letter, did not review the enclosures, and waited to receive the corrected letter. The second letter arrived with a few changes to the text; however, the due date still was incorrect. After calling Mrs. Bowers and Dr. Kotch's attention to the persistent error in the due date, a months-long series of email and personal communications between Dr. Weathers, MCH administrators, Dean's Office staff, and the Provost's office staff ensued, in order to establish the true due date for Dr. Weathers' reappointment package and determine the acceptable contents and format of the package. Because of the repeated relay of incorrect information to Dr. Weathers within the MCH department, Dr. Weathers had to rely directly upon the Dean's office staff—including interim Dean Dardess—in order to know what was needed to properly assemble and submit her reappointment package. Over the weeks and months of back-and-forth, the original reappointment file sequentially accrued a thick layer of multiple emails in front of the original incorrect reappointment letter (which was found near the rear of the folder). Once linked to the Dean's Office for assistance, Dr. Weathers created a second file in which to store the accurate information provided through the Dean's office, as well as to store her now bulky reappointment package materials. As a result, Dr. Weathers never again consulted the original reappointment letter, and until she discovered it, did not know that she had kept it. Because she did not review the enclosures, she also did not know that the Memo 1996 (Exhibit B) and the MCHRP 1996 (Exhibit C) were among the documents included in the mailing with the first incorrect reappointment letter. Moreover, neither of these two documents was enclosed with the second incorrect letter or was ever given to Dr. Weathers at a later date.

8

5.      It is reasonable for Dr. Weathers to not have been aware of documents sent to her in error, and as enclosures associated with a mailing mistakenly sent to her but intended for someone else. That she would not have reviewed the enclosures of such a mailing is more reasonable following instructions to destroy them. The truth of Dr. Weathers' testimony regarding having received instruction to destroy the letter and the enclosures is supported by none of them appearing in her personnel file. Moreover, the documents in the folder pertained to and were generated with regards to a reappointment process, and not a promotion process; therefore, there was no reason for Dr. Weathers to have consulted the folder for promotion guidance, even had there been no history of errors. It is reasonable that documents supplied as part of a mishandled reappointment process with repeated errors and incorrect information would not be consulted later by a faculty member. That Dr. Weathers did not know about the Memo 1996 and the MCHRP 1996 is supported by the defendants' own statements denying the policy—i.e., the defendants: 1) deny ever having any official promotion process in MCH, 2) deny ever having seen the RRPFP 1996, 3) deny having ever provided the RRPFP 1996 or any other departmental promotion documents to Dr. Weathers, 4) deny the validity and official status of the promotion document they "found on a computer" (RRPFP 1996), 5) deny having ever put in place or initiated any official promotion policy or process in MCH , 6) and deny differential treatment of Dr. Weathers in her promotion process compared to other faculty in MCH. Alternatively, I assert that it is *unreasonable* to assume that Dr. Weathers knew about and/or should have known about documents that even the defendants say do not exist. Therefore, the defendants could not have intended that she have them, have been provided them, or was aware of them. It also is unreasonable to assume that Dr. Weathers could or should know about enclosures that she had never seen in a file of information that she did not use. Moreover, it also

9

is unreasonable to assume—and it is not true--that Dr. Weathers was aware of the Memo 1996 and MCHRP 1996, but that she hid them, thereby weakening her own defense, whilst allowing the defendants to prevail at summary judgment and upon appeal to the 4th circuit court of appeals—all so that she could later make a motion, as a pro se litigant, for fraud upon the court in the hope that she might be granted a new trial. On the contrary, the existence of these two documents proves that the defendants were aware of them during the prior legal suit before the USDCNC and the U.S. Court of Appeals for the 4th Circuit; however, they withheld them and then denied knowledge of them in order to gain an unfair advantage in the USDCNC in order to hide their discrimination.

## EVIDENCE TAMPERING

6.      The Memo 1996 refers to Revised Review Procedures for Faculty Promotion (MCHRP 1996); however, comparison of the MCHRP 1996 to that produced by the defendants (RRPFP 1996; Bates stamp # D000053611; see Exhibit D) reveals a number of obvious physical discrepancies between the two. In other words, the document produced by the defendants for the court is a fraudulent representation of the official, approved MCHRP 1996. The discrepancies between the MCHRP 1996 and the RRPFP 1996 (submitted by the defendants), cannot be accounted for simply as the result of differences in computer used, font type or font size, margin change, file conversion, or photo reproduction. These discrepancies easily distinguish the MCHRP 1996 from the defendant's document (RRPFP 1996). The action steps appear to be the same between the documents: in other words, the two documents appear to describe the same procedural steps. All senior MCH faculty defendants would have been aware of the official process and documents during the discovery inquiries, the court hearings, and the pleadings put before the USDCNC--yet they collectively remained silent. Because none of the defendants— or

10

Mrs. Cotcamp—acknowledged the discrepancies between the RRPFP 1996 and the MCHRP 1996 during questioning and discovery, it is most plausible that the MCHRP 1996 was intentionally altered and then fraudulently presented by the defendants as the RRPFP 1996.

7.    A defense of the RRPFP 1996 as an earlier or draft version of the MCHRP 1996 now is untenable, because the defendants already have denied that the department has ever had or ever put in place or ever followed any official promotion process. In other words, it is illogical to now claim to have presented to the court a draft version of an official document wherein the existence of both the official document and its extant process were heretofore denied. To do so, admits the lie now exposed. Because the RRPFP 1996 is less well edited than the MCHRP 1996, one cannot reasonably argue that the RRPFP 1996 is a valid later version of the MCHRP 1996. One might then attempt to say that the RRPFP 1996 could be an earlier draft of the MCHRP 1996; however, this also is inconsistent with the defendants' prior testimony: 1) that no official process ever existed in MCH for faculty promotion (see defendants' Reply to Weathers' memorandum opposing summary judgment), 2) Dr. Peterson's statement that he never instituted any official promotion process in MCH (see Peterson's video and transcript), 3) Dr. Buekens' denial of having ever put in place any official process or procedures for faculty promotion (see Buekens discovery video and transcript), and 4) the entire senior faculty defendants denying an official process or evidence thereof (see evidence cited in #s 1 and 2 above). Such an illogical claim also is not consistent with a 2004 email from Dr. Kotch to Mrs. Bowers (found among the emails in the first reappointment folder) regarding the department's use of promotion documents for other faculty, nor the evidence in the discovery record documenting the process followed for other MCH faculty (see paragraph 42 herein). Notably, UNC-CH declined Dr. Weathers' request

during discovery to provide emails from the UNC-CH server from 2004 and earlier—where the aforementioned email could have been found earlier.

## FRAUD UPON THE COURT

8. Dr. Weathers asserts that the defendants intentionally withheld the Memo 1996 from the USDCNC. Dr. Weathers further asserts that the defendants intentionally presented to the honorable USDCNC the RRPFP 1996, whilst knowing it to be a fraudulent representation of the official MCHRP 1996. Dr. Weathers also asserts that the Memo 1996 and the MCHRP 1996 provide proof that prior to and at the time of Dr. Weathers' promotion review year, a long-standing formal and official process did exist within MCH for faculty members seeking promotion. I also assert that the fraudulently withheld documents (Memo 1996 and MCHRP 1996) and the fraudulently presented document (RRPFP 1996) are material to Dr. Weathers' claims under Alvarado, and that these documents raise a genuine dispute as to the material facts in her case. Moreover, both the content of the Memo 1996 and the manner in which it corroborates the official status of the MCHRP 1996 within MCH, prove that the defendants intentionally defrauded this honorable court. Because of this intentional dishonesty, I believe that the USDCNC now must consider that dishonesty also infuses the defendants' testimony in other regards--and perhaps even in other documents presented or referred to by them. The USDCNC also must consider that the defendants may have withheld other material documents. Specifically, not only can the defendants not be believed with regards to their testimony that they did not discriminate against Dr. Weathers in the promotion application process, but also the court now must consider that the defendants also were dishonest in their testimony that Dr. Weathers was not qualified for tenure, as well as in their testimony regarding their vigorous efforts to support her. In other words, because the fraudulently withheld Memo 1996 substantiates the

12

official status of the MCHRP 1996, it now can be understood that the true, official procedures within MCH for faculty seeking promotion and tenure involve: 1) an extended period of time prior to the departmental submission deadline, 2) peer collaboration and guidance between the faculty member seeking promotion and tenured senior faculty of different research experience levels, and 3) transparency in and foreknowledge of the official procedures and process to be utilized for promotion and tenure within MCH. Because the defendants withheld from Dr. Weathers the collaboration, information, advice, and guidance expected to be provided for faculty applying for promotion and tenure in MCH, I assert that the court should not now accept or believe the defendants' testimony regarding: 1) their substantial efforts to collaborate, inform, mentor, support, and guide Dr. Weathers towards tenure over her 7 years in the department, or 2) their testimony that Dr. Weathers was not qualified for tenure in the MCH department.

9.     The document that the defendants withheld from the USDCNC is a Memorandum from Dr. Pierre Buekens dated October 30, 1996 (Memo 1996). This Memorandum references enclosed "revised review procedures for faculty promotion which will be used in the Department". The departmental procedures referred to are entitled "Department of Maternal and Child Health Revised Review Procedures for Faculty Promotion October 1996" (MCHRP 1996); however, the defendants also withheld this document from the court, presenting it instead with a fraudulent version (the RRPFP 1996). These procedures outline a detailed, month's long series of internal, departmental instructions, expectations, and deadlines during the development of the promotion package, before the package is submitted to the MCH department for review by the full professors, and then subsequently in preparation for its submission to the Dean's office. The procedures in the MCHRP 1996 are directed to the faculty member seeking tenure, for more senior full and associate professors, and for the chair of the department. These procedures

13

include: expectations regarding the role that associate and full professors in the department are to play during the process—including their assistance and advice to the faculty member seeking tenure; expectations for the timing of the meeting of the full professors in the department, in order to review the faculty member seeking tenure; expectations related to the materials that the full professors are to review; expectations of the chair of the department while a faculty member seeks tenure; steps in the process for compiling the application materials; contents of the promotion application package; instructions to the faculty member seeking tenure regarding the selection of referent names; instructions to the senior faculty members regarding the assistance that they are expected to provide to the tenure candidate with regards to the selection of referent names to provide to the department chair; instructions to the department chair regarding the selection of referent names for soliciting letters; and deadlines that are to be carried out within the department *in advance* of the departmental submission deadline. In stark contrast to the detail of the MCHRP 1996, Dr. Weathers simply was given a single "deadline" for her to submit her promotion application materials to the MCH department, and the deadline by which MCH was to submit the package to the Dean's office.

10.     In summary, the document withheld from the USDCNC, by the defendants, provides evidence that: 1) in contrast to the testimony of the defendants, an official pre-departmental submission process did in fact exist internally within MCH for faculty seeking tenure, 2) the internal promotion process and procedures  had been approved by the faculty as the MCHRP 1996; therefore, the MCHRP 1996 was the official promotion process in MCH, 3) the internal, official process and procedures had been in place since 1996, and therefore were long-standing, 4) the internal, official, long-standing process had been distributed to all MCH faculty in 1996— including both senior and junior faculty (who would seek tenure in subsequent years), 5) because

14

the internal, official, long-standing process was distributed to all faculty in the department in 1996, all senior faculty employed in MCH, from the time of the approval of the Memo 1996 through the time of Dr. Weathers' promotion year (2007), would have been aware that the official process, procedures, and related documentation existed and had been approved for use in MCH. In short, the Memo 1996—the document fraudulently withheld from the USDCNC by the defendants--exposes to the court that the defendants were intentionally dishonest in their testimony to the USDCNC. In other words, the defendants lied to the court.

11.     In addition to withholding the Memo 1996 and the MCHRP 1996 from the USDCNC, the defendants also withheld this document from the resources and instructions provided to assist Dr. Weathers, as she developed her promotion package. I assert that these actions by the defendants constitute a type of racial discrimination generally classified as "modern-day" racism. Included among the expressions of "modern-day" racism by the defendants are: 1) their withholding of the documents, the information, and the support expected in Memo 1996 and MCHRP 1996, 2) Dr. Peterson's refusal to consider Dr. Weathers for tenure prior to the May 1, 2007 "departmental deadline" (see April 4, 2007 letter), 3) Dr. Rimer's lack of communication to Dr. Weathers of any options available to her to be able to still submit her package or to appeal the actions of the chair, and 4) UNC-CH's non-response to Dr. Weathers' request to the Provost to intervene and to appeal Dr. Peterson's actions. Because the official process and documents related to applying for tenure in MCH were differentially, intentionally, and systematically withheld from Dr. Weathers—a member of a protected class—during her promotion application process for tenure, however, these same documents and process were officially and systematically provided to and used by faculty in MCH who are not members of a protected class (see Memo 1996; Kotch email with Bowers 2004; letters on record in promotion packages of other MCH faculty), Dr. Weathers

15

asserts that these actions are evidence of intentional racial discrimination by the defendants in the tenure application process for her.

## "MODERN-DAY" RACISM AND DISCRIMINATION

12.     In order to render a fair decision in employment discrimination cases, it is critical for finders of fact to acknowledge and consider, in their jurisprudence, acts of discrimination mediated by "modern-day" expressions of racism (McConahay 1983; Chew 2010; Gertner and Hart 2012). Dr. Weathers believes that the judicial review of her case in the USDCNC neither acknowledged "modern-day" forms of racism and discrimination in its analysis nor considered them in its jurisprudence. As a result, she believes that the court erred both in its judgment and in its final decision. Therefore, I will provide a brief discussion of "modern-day" racism in the following paragraph. Subsequent to that discussion, I will describe the harm to Dr. Weathers that resulted from the defendants' actions and expressions of "modern-day" racism.

13.     A sizeable body of scientific literature now documents the existence and the importance of non-traditional expressions of racism and racial discrimination in the U.S. (Gaertner and Dovidio 1977; David L Frey and Gaertner S L 1986; Gaertner and Dovidio 1986; Dovidio J F, Kawakami et al. 2002; Ziegert JC and Hanges PJ 2005; Bonilla-Silva 2010; Hodson, Dovidio et al. 2010; Trepagnier 2010). These non-traditional expressions of racism and discrimination are generally referred to under the broad category of "modern-day" racism. Other names commonly used to describe expressions of "modern-day racism" include: "silent racism" (Trepagnier 2010), "new racism" and/or "color-blind racism" (Bonilla-Silva 2010), "subtle racism" and/or "aversive racism" (David L Frey and Gaertner S L 1986; Dovidio J F, Kawakami et al. 2002; Adam R. Pearson, John F. Dovidio et al. 2009). Common to each of these modern-day forms of racism and discrimination is the expression of racist ideologies and/or acts of discrimination in ways that can

16

be made to appear and/or be interpreted as non-racist in origin. As such, the apparently non-racial or "race-neutral" expressions function as a decoy, cover, or mask behind which the true racist ideology or discriminatory intent hides. Indeed, the conceptual frameworks posed by these scientists predict—and their study results show—that expressions of racism and discrimination are exemplified despite an individual's strong expression of a lack of racial animus, and in the face of an individual's stated belief that they are "color-blind", tolerant, and not racist. In silent-racism, the conceptual framework is similar to that of other forms of "modern-day" racism; however, this framework goes beyond the others to also explain the behavior of individuals who participate in racial discrimination by remaining silent in the face of observed overt and/or "modern-day" forms of racism. Moreover, a number of scientists have specifically treated the issue of discrimination against members of protected classes in colleges and universities (Moody 2004; Massachusetts Institute of Technology 2010; Christian 2011; Moody 2012).

14.     The expression of "modern-day" racism and racial discrimination contrasts with the more overt nature of traditionally recognized expressions of racism and discrimination. In traditional expressions of racism, racial "slurs" and derogatory comments regarding the behavior, abilities, or proclivities of the targeted group are overtly and openly communicated. Rather than an attempt to hide, the overt and open nature of the expressions and acts committed reveal the generally acceptable status that they enjoyed within society, and the impunity with which the speaker felt that the expression could be uttered or the act committed. Similarly, traditional expressions of racially-based discrimination include overtly visible signage, actions, policies, and practices. In part, the social acceptability of the comments and the sense of impunity felt by the speaker were based upon a sense of security that no negative consequences would ensue upon their expression.

17

15.     Title VII of the Civil Rights Act of 1964 (Title VII) has resulted in a transformed

dynamic with regards to expressions of racism and racial discrimination in the U.S. Now

increasingly seen as socially unacceptable and legally actionable—especially in the workplace,

overt expressions indicating an ideology of racism or an attempt to openly discriminate against a

member of a racially protected class enjoy less social acceptability and less freedom from

impunity. As such, those who continue to harbor racist ideologies and/or who attempt to act on

those ideologies via discrimination--but desire to hide them--are routed to non-overt expressions

in order to achieve the same ends. When such persons occupy positions of authority within a

unit or an institution, their overt and/or covert example raises the "acceptability" of

discrimination in the environment generally, and thereby can guide others to join in, ignore, or

even initiate their own acts of discrimination.   To avoid exposure, these individuals will often

identify reasons that can appear non-racial to explain their racist beliefs, assumptions,

statements, and discriminatory actions. They also may employ covert or hidden actions to cover

their discrimination. With particular importance for Dr. Weathers' case, the actions described by

social scientists as among key tools used in modern day forms of racial discrimination include:

withholding of needed, helpful, or useful information, collaboration, and support;  avoidance of

association; "incivility" in interpersonal interactions; and both silence and collusion in the face

of expressions of racism and acts of racial discrimination.

16.     Expressions of "modern-day" racism often, then, are explained by a denial of the

accusation, followed by non-racial explanations (the cover story).  Implicit to the functioning of

the non-racial decoy or cover story, however, is the actor's and the *hearer's assumptions* that the

target was not, or perhaps could not possibly have been, exhibiting the model behavior.  In other

words, the "model" or "desired" behavior and actions function as "code words" for an ideology

18

of racism directed to a specific group. For example, after denying discriminatory treatment, a person employing or contributing to racial discrimination might describe their actions as in response to an African American target that was unpleasant, loud, difficult to work with, untimely in submitting work, seemingly unable to understand what is repeatedly being told to them, not taking initiative or exhibiting low motivation. A hearer or finder of fact who harbors similar attitudes—whether knowingly or unknowingly—will be more likely to accept the version of events as offered by the discriminators. Withholding of information is even more easily hidden by discriminators, as the target may get inferential clues regarding the behavior as adverse and/or discriminatory, but not be able to actually provide the information withheld or to persuade others in the environment to admit what they know. In such a case, the target can be made to appear to make baseless accusations, or be described as blaming others unfairly, not taking responsibility for their own inadequacies, or having brought everything upon themselves.

17.     Despite the increased use of non-traditional, "modern-day" forms of racism and discrimination, a growing literature notes that jurists often do not include, acknowledge, or account for expressions of "modern-day" racism and discrimination in either their analyses or their jurisprudence [Chew, P.K.; Gertner, N. and Hart, M]. As pointed out by social scientists, the key to uncovering these "modern-day" forms of racism and discrimination is investigation and analysis, as well as examination of the target's particular work context and their actual behavior—as contrasted with the discriminator's report and interpretation of the behavior and response of the target. Civil rights laws transformed the racism and discrimination dynamic regarding what is acceptable in our society; alone however, they are insufficient to eradicate an ideology of racism and/or to prevent discriminatory acts from actually occurring. In order to do this, we first must recognize the continuing influence of racism and discrimination in our society;

19

recognize that their expressions are not static across place and/or time; recognize that when overt expressions of racism are muted, we open passage for their mutation and for covert and hidden forms of racism and discrimination to increase; acknowledge that expressions of racism and discrimination do not need to be spoken or visually displayed to exert an adverse effect; and investigate—in order to expose the hidden faces, decoys, and masks of "modern-day" expressions of racism and discrimination. In other words, it must be recognized that, in our current times, the vanguard of racial discrimination is in acts of subtle, "modern-day" racism and discrimination.

18.     In the face of the now substantial and more than three decades of scientific literature documenting a variety of "modern-day" forms of racism and racial discrimination in the U.S.—and in order to remain faithful, in their jurisprudence, to the expectations and the promises of Title VII of the Civil Rights Act (1964)--jurists must broaden their definitions of racial discrimination to include its "modern-day" expressions. The need to "interpret Title VII liberally and flexibly" (Chew 2010) is noted by Judge Golberg of the 5th Circuit Court in Rogers v. EEOC, 1971 (Rogers), and by Justice Rehnquist in Meritor Savings Bank v. Vinson, 1986 (Meritor). Moreover, the Supreme Court directly addresses the expectation that lower courts consider non-traditional, overt practices of discrimination in Griggs v. Duke Power Co., 1971 (Griggs). That decision, delivered on behalf of the court by Justice Burger, states in reference to Title VII (the Act):

> *"The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." (section 431).*

Hence, early jurisprudence exists, at both the Circuit and Supreme Court levels in the U.S., that already has recognized the implicit importance of-- and the need for--a broad and flexible

20

interpretation of discrimination towards fulfilling the intent, the purpose, and the promise of Title VII of the Civil Rights Act (1964). The past thirty-plus years of social science research underscore that the need for jurists to maintain a broad interpretation of racial discrimination has not lessened: this need seems, in fact, to have increased. For the courts of today, then, an important step is to recognize that until the arc of the pendulum of our society swings solidly away from primarily *legislation* against discrimination and moves to rest firmly within a reality of *eradication* of discrimination, we serve Congresses' intent and our society's interest best by tending towards a broad interpretation of what constitutes acts of racial discrimination. Moreover, in order to remain relevant, this broad interpretation of discrimination also must be as flexible as the ill of racism itself. In order to do this, jurists and finders of fact that review and judge cases of individuals pleading for protection from discrimination under Title VII of the Civil Rights Act of 1964 must: 1) remain knowledgeable regarding the varied ways that racial discrimination is expressed, 2) strengthen their analyses by allowing a broad interpretation of discrimination, and 3) consider "modern-day" expressions of racism and racial discrimination in their jurisprudence.

19.     The defendants' employ of "modern-day" racism directed to Dr. Weathers, as she worked to develop and submit her application package for promotion and tenure in MCH, compromised a fair and impartial review of her complaint before the USDCNC, where she sought relief from employment discrimination. In light of the discovery of the fraudulently withheld documents, finders of fact now can better understand the plight within which Dr. Weathers found herself as she worked to prepare and submit her promotion package. In particular, we now can see why her questions and concern about the new and changing requests at the tail end of the promotion application development and submission process were reasonable. The effects of "modern-

day/silent" racism and discrimination [from hence I will use this term to reflect "modern-day" racism and discrimination generally, along with those additional expressions captured under the concept of "silent-racism"] in Dr. Weathers' promotion application process include, but were not limited to: 1) discrimination in the application development and submission process (Drs. Peterson, Kotch, Martin, Foster, Rimer), 2) discriminatory obstruction of submission of her promotion package coupled with non-consideration of her for tenure prior to the "departmental deadline" of May 1, 2007 (Dr. Peterson), 3) discriminatory prevention of her receipt of a full and proper review of her qualifications for tenure via the established tenure review system for faculty at UNC-CH (Drs. Peterson, Kotch, Martin, Foster, Rimer, and UNC-CH), 4) discriminatory non-reappointment or promotion with tenure (Drs. Peterson, Kotch, Martin, Foster, Rimer, and UNC-CH), and 5) discriminatory ending of her employment (UNC-CH).

20. As a first step towards understanding the effects of "modern-day/silent" racism and discrimination in Dr. Weathers' tenure promotion process, one need only consider the true process as was enjoyed by other faculty. The first observation that can be made, based upon the official MCHRP 1996, is that there existed two prongs to the promotion process in the School of Public Health (SPH): 1) a process prior to the packages' submission to the department, and 2) a process subsequent to the departmental submission. From the MCHRP 1996, it can be seen that the first prong of the process—the pre-departmental submission component--was supposed to be equitably applied across faculty members; involve collaboration, guidance, and advice from senior faculty members; be ordered; be transparent; involve foreknowledge of the procedures, process, and expectations so that the faculty members undergoing the process could be responsive to pre-established deadlines; maximize the quality of the package contents and format, as well as the quality of the external and internal reviews; and promote the ability of the

22

faculty member to submit a timely promotion package for review. In other words, within MCH, a faculty member not presented with the RRPFR 1996 for their promotion would be completely unaware of and uninformed regarding the existence of the entire, official pre-departmental submission process. Specifically, they would be: 1) unaware of any deadlines and expectations prior to the departmental deadline given to them for submission of the promotion package, 2) unable to plan effectively for task completion based upon the procedures, 3) uninformed regarding the basis of requests for materials or changes that are not consistent with the single departmental submission date provided to them—and therefore prone to question these requests, and 4) vulnerable to the harmful effects of others' mistakes and errors, and thereby risk jeopardizing the quality and timeliness of their package submission. In short, the faculty member would be unaware of and uninvolved in months of official and collaborative activities intended to support them. The unaware and uninformed faculty member would plan their entire year of activities—those related directly to promotion application development and submission, and those not related directly to promotion application development and submission (such as grant writing and submission, teaching, scholarly meetings, grant reviews, committee work, vacation and other personal time, presentations, etc.)--completely unaware of the steps and deadlines in the first prong of the MCHRP 1996. Put simply, said faculty member would be left in the dark regarding the entire pre-departmental submission process.

21.    While all faculty members in the department from October 1996 forward would have been aware of the approval of and the procedures involved in the pre-departmental submission process for promotion and tenure, this entire initial prong of the process was withheld from Dr. Weathers (who began her employment in MCH in December 2001). MCH faculty since October 1996 were able to engage in a pre-departmental submission process that was transparent, known,

official, ordered, early, equitable, and which maximized both their ability to be responsive and the quality of their submission. In contrast, Dr. Weathers was put through a process that was non-transparent; lacked official underpinning; abruptly changed from week to week at she approached its "deadline"; was chaotic; that pointed her to a single, terminal "departmental" deadline—rather than allowed her to enjoy, as could other faculty, the benefits of foreknowledge and transparency, and whereby she could pace herself for work completion and meeting of deadlines; undermined her ability to be responsive; and that inappropriately relieved senior faculty in MCH from providing her with advice during the pre-departmental submission process.

22.     For example, without the MCHRP 1996, Dr. Weathers had no way of knowing that the date of May 1, 2007--given to her as the "departmental deadline"—was incorrect. Under the MCHRP 1996, the latest departmental submission deadline would have fallen on or about April 13th—the time by which the MCHRP 1996 specifies that the faculty member's promotion materials, along with the letters, should be available for review by the full professors. Dr. Weathers was never given this deadline. Without the benefit of the MCHRP 1996 at the time of her promotion, Dr. Weathers was unaware that her promotion materials—along with the returned letters of recommendation—were to be available for review by the full professors in advance of the May 1, 2007 date given to her as the "departmental deadline", and no later than six (6) weeks prior (about April 13, 2007) to the Dean's deadline (May 25, 2007). Similarly, because Dr. Weathers was not informed about the earlier April 13, 2007 deadline for the full professors' review of her entire package and the referent letters, she could not then logically deduce either: 1) that the names of the referents were to be submitted in advance of the May 1, 2007 "deadline", or 2) the specific date of the advance deadline (which by the MCHRP 1996 was no later than 3 months prior to the Dean's deadlines). A date of three months prior to the Dean's deadline

24

places the latest date for referent name submission by the candidate, under the MCHRP 1996, on or about March 2, 2007. However, in response Dr. Weathers inquiry regarding why Ms. Cotcamp was requesting the names by March 1, 2007—i.e., two months before the May 1, 2007 date, rather than provide Dr. Weathers with or make reference to the MCHRP 1996, Dr. Peterson abruptly introduces a near weekly, retrograde sequence of alternative dates for the names. These three alternative dates move closer to the May 1, 2007 date originally given to Dr. Weathers and ultimately end on March 21, 2007. Unaware of the MCHRP 1996, Dr. Weathers receives Dr. Peterson's requests skeptically. This skepticism results from the fact that the dates are being offered as acceptable despite moving closer to the originally set date of May 1, 2007, and they exhibit an unusually wide, three-week range. Her skepticism is heightened as the requests are inconsistent with the information that was given to her for her promotion, inconsistent with the reasons that Dr. Peterson says that the names are being requested earlier than May 1, 2007, and inconsistent with the well-known general observation that academic application submission processes that involve pre-submission deadlines also are accompanied by official guidance that makes the process available to and accessible by all seekers. The reasonableness of her skepticism and questioning of changing dates and requests for information is validated by the numerous erroneous dates and incorrect requests for unneeded information that were made to her by MCH during her reappointment process. In the light of the truth, Dr. Peterson's retrograde sequence of dates not only are inconsistent with the letter and the spirit of the MCHRP 1996 guidance, but also they clearly leave insufficient time to seek and secure referents, and then to obtain an unhurried review before the April 13, 2007 deadline. In other words, the alternative dates are offered and the names are requested in a manner which presents

25

an implicit conflict with the reason for which and the times by when Dr. Peterson says that he needs the names.

23.      Most telling, however, is that as of March 21, 2007 Dr. Peterson still had not informed Dr. Weathers that her entire set of promotion materials—upon which she was still working to meet the May 1, 2007 "deadline"—would be due before May 1, 2007.  In fact, it appears from the timeline provided by the MCHRP 1996 that, in order for external reviewers to review the application package and respond with a reference letter on or about April 13, 2007, Dr. Weathers' promotion materials would have needed to have been completed three months or more before the Dean's deadline—in order to be sent to the referents.  Moreover, Dr. Peterson never requested Dr. Weathers' most recent Curriculum Vitae (CV; a document to be included in and submitted with her promotion materials) to assist referents with a decision as to whether or not they could perform the review—a step noted in the School of Public Health Appointment, Promotion's and Tenure (APT) manual as to be performed by the chair of the department. In the light now of the truth, it is clear that, because under the MCHRP 1996 a date on or about April 13, 2007 can now be seen to have been the true departmental deadline for Dr. Weathers' promotion package materials, even if Dr. Weathers had submitted the package by the May 1, 2007 date given to her by Dr. Peterson, the package would have been untimely and late.  Now in the light of the truth, it is clear that submitting the promotion package in to the MCH department would have been a futile gesture, for the defendants had already used "modern-day/silent" racism and discrimination to systematically put in place the steps to be able to deem Dr. Weathers' package as untimely and refuse to promote her even had she turned in her package by the false "departmental deadline" of May 1, 2007.  Dr. Peterson seems to acknowledge this very fact by his comments in his April 4, 2007 letter sent to Dr. Weathers—in advance of the May 1, 2007

26

"deadline", in which he states "I have done all that I can to adhere to the School's process for appointments, promotions, and tenure..." and "I cannot proceed with the process as outlined in the manual."

24.     Dr. Weathers was misled and ultimately harmed by the defendants' discriminatory actions. The defendants argued that because the dates under the MCHRP 1996 were earlier than the dates put in place by Dr. Peterson, his dates were in fact more generous to Dr. Weathers; therefore, Dr. Weathers was not harmed by not having the documents. However, this claim is contradicted by both the letter of the Memo and the MCHRP 1996—which make official an earlier pre-departmental submission process, and the spirit of the MCHRP 1996--which is open to and functions as a "heads-up" for earlier submission of documents. That the spirit of these procedures leans towards the value and benefit of earlier submissions is borne out by the use of terms such as "no later than"--with regards to the submission of the list of names to the chair, and "will be available six weeks prior to the deadline..."--with regards to the materials and documents for review by the full professors. However, the positive effect of the letter and spirit of early submission in the MCHRP 1996 is enhanced and actionable only when the faculty member has sufficient foreknowledge of its contents, authenticity (Memo 1996), and relevance to *their* promotion process to be able to be responsive to its deadlines and expectations. By withholding the Memo and MCHRP 1996 from Dr. Weathers for her promotion, Dr. Peterson and the MCH senior faculty created an environment that diminished—rather than enhanced--Dr. Weathers' ability to be responsive: they also maximized the probability that, given her conscientious nature, she would question the inconsistencies being presented to her. In short, the defendants were dishonest and discriminatory in their treatment of Dr. Weathers towards preparing and submitting her promotion material for tenure.

25.     Finders of fact also can conclude, from the preceding discussion, that without the benefit

of both the MCHRP and Memo 1996, Dr. Weathers was left differentially dependant solely upon

Dr. Peterson and Ms. Cotcamp during her promotion process, as compared to faculty who

enjoyed the benefit of both documents for their promotion process. As a result, Dr. Weathers

was left differentially vulnerable to harm that might result from their errors, omissions,

misinterpretations of the procedures and process, slip-ups, and even malice. For example, and

as described anteriorly, without the MCHRP 1996, Dr. Weathers had no way of knowing that the

May 1, 2007 date towards with she had been pointed as the due date for her promotion materials

by Dr. Peterson and Ms. Cotcamp was actually incorrect. Moreover, without the MCHRP 1996,

Dr. Weathers had no way of knowing that the letters of reference were expected to be available

in the department prior to the May 1, 2007 "deadline" and available for the full professors on or

about April 13, 2007. Notably, this means that the full professors could not have been expected

to meet for Dr. Weathers' promotion review in October 2007—a date several months after even

the Dean's deadline (May 25, 2007)—and as testified to by Dr. Peterson. Tellingly, no senior

faculty member expresses concern about the October 2007 date to review Dr. Weathers, nor

which two of them were to have advised her in the application process. Moreover, Ms. Cotcamp

expresses exasperation and incomprehension as to Dr. Weathers' behavior and why she did not

just turn in the names when she [Ms. Cotcamp] asked her to, as "other faculty since Dr. Weathers

turned them in within a week" [see Cotcamp deposition]. However, now in the light of the truth,

finders of fact can see that Ms. Cotcamp was fully aware that the MCHRP 1996 was not

provided to Dr. Weathers among the resources for her promotion.

26.     A third conclusion that now can be drawn, in light of the truth, is that simply identifying

a single due date by which Dr. Weathers was to submit her promotion materials was not

sufficient information from which she either could deduce that an official, pre-departmental submission process existed in the department, or could deduce the procedures of the unknown process. Similarly, we now can conclude that without foreknowledge of the pre-departmental submission prong of the process, the School Wide APT manual guidelines—the link to which Dr. Weathers was directed by Dr. Peterson and Ms. Cotcamp as her "main source of information"—is an insufficient resource upon which to be responsive and timely with regards to the expectations of the official, pre-departmental submission process (MCHRP 1996). In particular, the School Wide APT manual neither indicates the existence of the official MCH pre-departmental process, nor provides information on any of its dates or procedures.

27.     In summary, the defendants' use of "modern-day/silent" racism and discrimination to hide the official promotion procedures and pre-departmental submission process from Dr. Weathers left her completely dependent upon the ad hoc and unofficial process applied to her by Dr. Peterson and Ms. Cotcamp. After having been intentionally steered to a single, erroneous end deadline for her materials (May 1, 2007)—with no mention by them of the preceding, months long, collaborative, and official procedures and deadlines prior to the application package's submission to the MCH department—Dr. Weathers dutifully and earnestly planned for the submission of her materials by May 1, 2007. However, after almost a complete year (9 months) of being allowed to remain on this path, Ms. Cotcamp and Dr. Peterson abruptly began to make requests that now can be seen to loosely—but far from faithfully--track the procedures in the MCHRP 1996. Unaware of the MCHRP 1996 and the Memo 1996, Dr. Weathers behaves reasonably when she politely questions the purpose and the basis of the new requests. Dr. Weathers' suspicion is raised because the new requests conflict with what should occur under the information provided to her, and are not accompanied by a basis in official guidance or policy.

29

Rather than inform her of the MCHRP and Memo 1996, Dr. Peterson strings Dr. Weathers along [see Spring 2007 email string] with changing dates, emphasizes his strong intentions "to be clear" with her, insists that he is doing all that he can to assist her, places the blame on Dr. Weathers for not allowing him to comply with policy, abruptly and without warning refuses to consider her for promotion and tenure (April 4, 2007 letter), and offers her no other options that may be available to her.

28.     Now in the light of the truth, we see that Dr. Weathers' polite questioning of Dr. Peterson and Ms. Cotcamp was the reasonable response of a person kept in the dark regarding the basis and validity of the requests being made of her. Because Dr. Peterson and Ms. Cotcamp produced no evidence that their new, last minute, changing, and contradictory requests were based upon official departmental or university policies or guidelines, they appeared to Dr. Weathers as unofficial, personal requests. For this reason Dr. Weathers reiterates her desire and "preference" to submit her package as a unit. Because Dr. Peterson and Ms. Cotcamp were fully aware of the MCHRP and Memo 1996--as well as aware that they had not informed Dr. Weathers regarding the internal MCH procedures and process--their actions can now be seen for their true intent: 1) an intentional attempt to misinform, manipulate, and mislead Dr. Weathers, such that submission of her promotion package would be prevented, while they would seem to have bent over backwards to assist her, 2) undermine the quality of the application package by not providing her with senior faculty advisors for the process, 3) prevent her from obtaining a proper, full and independent review of her promotion qualifications outside of MCH--including preventing her review by the tenure committees of UNC-CH, and 4) an effort to hide the MCHRP 1996 and the Memo 1996 from Dr. Weathers, so as to leave her unable to provide a credible defense against their discriminatory actions if later reviewed by finders of fact.

29.     Silent racism does not mean ineffective racism. Nor does it mean the absence of discrimination. The defendants' discrimination against Dr. Weathers via "modern-day/silent" racism effectively achieved their goal of preventing her from attaining tenure. The defendants' action to withhold from Dr. Weathers the MCHRP 1996 and the Memo 1996 at the time of her promotion application year--as well as their collective silence regarding these critical documents, the information they contained, and the support that they stipulated--were effective in derailing Dr. Weathers' opportunity for consideration for tenure or even to ever be reviewed by a tenure committee. I assert that in this case, the defendants employ of "modern-day/silent" racism and discrimination yielded for them an even greater benefit than overt racism ever could have: that is, that their tactics of "modern-day/silent" racism and discrimination left Dr. Weathers unable to properly defend herself in a claim of racial discrimination. For by their very nature, acts of racial discrimination committed silently emanate from that which is withheld, rather than that which is produced or stated. Because of this, the evidence of "modern-day/silent" racism and discrimination must be uncovered in order to be exposed. Herein, however, lies hope for plaintiffs, such as Dr. Weathers, as well as for finders of fact in judicial systems. In order to be effective, the tactics of "modern-day/silent" racism and discrimination not only must be used against the target, but also they must be hidden and covered up in an attempt to defraud the court. Therefore, it is through the courts' recognition and analysis of discrimination resulting from "modern-day/silent" racism and discrimination—as well as their intervention to allow plaintiffs to proceed to trial when found or suspected--that our society's best hope rests for justice against discrimination, and an end to racial discrimination in universities.

31

## *GAINS OF SILENT RACISM—INCLUDING EFFECT ON THE COURT*

30.    I assert that the defendants used "modern-day/silent" racism and discrimination in order

to be able to: 1) hide their discrimination against Dr. Weathers in her promotion application

process, 2) attempt to discredit an argument of non-support of Dr. Weathers for secondary and

lower authorship, and 3) enhance the probability that their assessment that Dr. Weathers was not

qualified for promotion and tenure would be accepted and believed by finders of fact.  That the

defendants' attempted to hide their discrimination is evident in that they withheld the MCHRP

1996 and Memo 1996 from, and never mentioned them to, Dr. Weathers as among the resources

provided to her for her the purposes of her promotion preparation.  The importance of these

documents to Dr. Weathers' legal case is evident in that the defendants also defrauded the

USDCNC by withholding from it the Memo 1996.  In other words, the defendants withheld the

very document that proves the existence of an official, internal pre-application submission

process in MCH, while they simultaneously testified that there was no evidence that such a

process was official or had ever been official in MCH.  Because the defendants argued that no

formal process had ever existed in MCH, as well as confirmed in their deposition testimony that

they never provided to Dr. Weathers the MCHRP 1996, the Memo 1996, or any documentation

other than the web-based School of Public Health APT manual, we have proof by their own

words that they did not intend—nor did they expect--that Dr. Weathers should have been

provided, informed about, or aware of the withheld documents or their contents.  In other words,

without the MCHRP 1996 and the Memo 1996 to confirm it as the official process in MCH,

along with the defendants' claims of their equal treatment of Dr. Weathers, as compared to other

MCH faculty, discrimination is not apparent to finders of fact who give deference to university

administrators in their testimony regarding its policies and procedures.  Therefore, the

32

defendant's use of "modern-day/silent" racism and discrimination—followed by fraud--allowed them to avoid a finding of discrimination in Dr. Weathers' tenure application process by the USDCNC.

31.     In addition to avoiding a finding of discrimination generally, "modern-day/silent" racism and discrimination was used by the defendants in order to enhance the probability that finders of fact would accept and/or believe their testimony regarding Dr. Weathers' qualifications for promotion and tenure, rather than accept and/or believe Dr. Weathers' testimony regarding the evidence already available in the record.  A finding of non-discrimination in Dr. Weathers' application process for promotion and tenure was critical towards the USDCNC's acceptance of the defendants' position that Dr. Weathers was not qualified for promotion and tenure.  By its nature, the true application process for faculty promotion in MCH was to be based upon collaboration between the junior faculty member and more senior faculty advisers. It is important for finders of fact to understand that the MCHRP 1996 guidelines call for senior faculty scientists as advisers; however, Dr. Peterson directs Dr. Weathers for advice solely to Ms. Cotcamp.  By her own deposition testimony, Ms. Cotcamp affirms that she is "only a clerk". Moreover, the entire full professors, the department chair, Human Resources, and the Dean's office all have key and defined roles in the promotion application process for a junior faculty member.  Therefore, if a determination is made that no discrimination occurred in the application process for promotion and tenure, then the defendants' claims of extraordinary support and collaboration for scholarship and other activities are more likely to be accepted and believed, than are the plaintiff's claims of non-support.  In other words, a finding of non-discrimination in the application preparation and submission process was the buttress needed in order to reinforce the architecture of a defense against Dr. Weathers as qualified for promotion.  On the other hand,

33

a finding against the defendants of discrimination in the application process—a process that

inherently requires collaboration, guidance, and foreknowledge-- would cast doubt on their

claims of similar support in other areas, and thereby obligate the court to consider that racial

discrimination also may have played a role in the defendants' rejection of Dr. Weathers

application, as well as in their assessment of her as unqualified. So important to the defendants

was the need to cover up their non-support of Dr. Weathers in order to support their claim that

she was not qualified for promotion and tenure, that in order to do so, they resorted to defrauding

the USDCNC in order to hide the evidence that could solidly prove both their lack of support and

their discrimination.

## DR. WEATHERS' QUALIFICATIONS

32.    We assert that Dr. Weathers was qualified for promotion and tenure within MCH.

Moreover, the evidence for her qualifications is in the record, and was present in the record

before the USDCNC. However, in making their claim that Dr. Weathers was not qualified for

promotion and tenure in MCH, the defendants were dishonest in their testimony to the

USDCNC. Specifically, the defendants intentionally misinformed the court regarding a number

of issues, including: the true role that the department's assessment plays in the determination of

faculty tenure at UNC-CH, Dr. Weathers' true qualifications, the period upon which a tenure

review is based, the basis upon which others in MCH have been granted tenure, the true extent of

administrative latitude allowable in the application submission and review process, and what

constitutes a tenure review. Moreover, the defendants misled the court in their use of summary

statistics for faculty publication numbers. As I address these points in the following paragraphs,

it is critical that finders of fact realize that the discriminatory actions of the defendants

preempted Dr. Weathers from ever receiving a review by *any tenure committee* at UNC-CH. In

34

short, and in contrast to other faculty seeking tenure, she was never evaluated outside of MCH. Instead, the very faculty who discriminated against her and subsequently defrauded the USDCNC —the defendants in this case—then usurped the tenure committees and process at UNC-CH and substituted their biased assessment of Dr. Weathers' qualifications in the place of the assessment that should have resulted from a full and proper tenure review. The defendants then presented and represented their single and biased assessment to finders of fact—including the USDCNC, as if it was the result of the university's tenure review process and as if it equaled that process in rigor, weight, outcome, and authority.

33.     The assessment of a faculty member's qualifications for tenure is a multi-level, multi-person process that begins with the recommendation of the department's full professors to the chair of the department. It is important to note that the full professors provide only a recommendation to the chair. The chair then provides a recommendation to the Dean. In the School of Public Health, the Dean seeks the input of the School of Public Health's APT committee in order to make a recommendation to higher levels within the university. Therefore, the School of Public Health's APT committee is the first tenure committee to review the candidate. From the Dean, the promotion package and recommendations proceed through a series of higher administrative committees for review, including the UNC-CH APT committee, before going to the Chancellor's office and the Board of Trustees and/or Board of Governors. At any point along the process, higher committees can disagree with the recommendations of lower committees, as each level provides independent review and weighs the candidate's record within the interests of the university and each level's unique perspective. In other words, neither the recommendation of the full professors nor the recommendation of the chair of the department is

35

a tenure decision. They are *recommendations*. Nor can the reviews of the full professors, the chair, or the Dean take the place of a final tenure decision.

34.     A key focus of the UNC SPH APT review is independence in scholarship. Collaboration is encouraged, but does not supplant evidence of independence in publications and grants procurement. Moreover, the APT manuals outline a number of ways that one can demonstrate excellence in scholarship. The faculty handbook is clear that independence as a scholar is the primary outcome that a faculty member needs to demonstrate for promotion and tenure, and that primary scholarship is paramount. The faculty handbook demonstrates ways that this can be demonstrated. The handbook identifies several ways that a faculty member can demonstrate collaboration—grants, manuscripts (where they may lead the team as the first author), review committees, etc. There is neither a requirement nor even an insinuation, in the handbook, that secondary or lower supporting authorship is the only or even expected way to achieve collaboration. One can equally achieve collaboration as a lead author with others as supporters (as did Dr. Weathers). More importantly, there is no stated requirement or insinuation in the handbook that supporting authorship is either an expectation or a requirement for tenure. What is clear from the handbook is that supporting authorship is one way to demonstrate collaboration; however, many other acceptable ways also are listed.

35.     It is critical that finders of fact understand that Dr. Weathers never received a tenure review; therefore, the assessment of her qualifications as presented to the USDCNC, by the defendants, does not represent the decision of the tenure review process at UNC-CH. Departments are not tenure committees and do not perform a tenure review. Departments cannot confer or deny tenure. The faculty hearing process is not a tenure review. The defendants presented to the USDCNC the assessment of the department that Dr. Weathers was not qualified

36

for tenure. In addition to not representing the decision of a proper tenure review process, the nature of the information presented to the court by the defendants is further compromised by both its post hoc nature, and basis in non-current information. That is, the MCH assessment came only after Dr. Weathers retained counsel, and the assessment did not result from review of the promotion materials that Dr. Weathers did submit in advance of the October 2007 meeting of the full professors--but rather from documents from 2004 introduced by Dr. Kotch. The promotion package sent in by Dr. Weathers was sufficiently complete upon which to base a decision for tenure. Moreover, from Dr. Weathers' recent CV—which was available to them—they could have seen that her qualifications surpassed those of the previous MCH faculty member that the record shows to have been granted tenure. More importantly, the assessment by MCH that Dr. Weathers was not qualified for tenure, as well as a recommendation that she not be granted tenure could have been overturned during the tenure review process. In other words, the tenure review committees might have reviewed Dr. Weathers' record more favorably than the department's assessment. Her strong record of independence and leadership as a scholar would have been obvious to any tenure committee. That the defendants all were aware that their assessment did not equate to a tenure review, and yet they offered it as the result of such a review, speaks to their intent to deceive the court.

36.      Upon what basis can a jurist make a fair decision regarding the evidence of a plaintiff's qualifications for promotion under the McDonnell Douglas framework, when the qualifications presented to the court are not those of the university's tenure committees, and did not derive from the university employers having followed the proper tenure review procedures? In other words, if the discriminatory actions of employees prevent a full and proper tenure review of a member of a protected class, and then the courts allow the employer to submit the assessment

37

derived at as a result of discrimination, then scholars who are members of protected classes can be systematically denied fair reviews for tenure, deemed unqualified by the departmental discriminators, and then not reappointed and/or promoted. The treatment may not ever get to higher administrators, who could just be told that the faculty member "made a decision to forgo promotion" and did not submit a package. Moreover, protected minority faculty would be differentially vulnerable to a revolving door of academic impropriety and discrimination, as compared to those who are not members of protected classes. The situation is made almost hopeless for those in protected classes when the tools of "modern-day/silent" racism and discrimination—coupled with fraud—then blind the courts to the discrimination. In such cases, no matter how many allegations, affidavits, or testimonials are presented by either side as "facts", each party remains unable to state what would have resulted from the multi-layered, multi-factorial, and multi-perspective process of tenure review already in place at the university. No proffered evidence (whether of article numbers, affidavits, or anything else)—no matter how extreme, voluminous, or lettered—can substitute for what the recommendations of the true tenure committees would have been *in the plaintiff's particular case*, or on the decision that the decision maker would have made given the recommendations.

37.     I believe that a dilemma for the pre-trial fact finder, in such a case, is that the dispute is not over the material tenure decision—as resulting from tenure committees' assessments and recommendations, or even the ultimate decision maker's decision in the face of those recommendations, but rather the dispute reduces to a disagreement over what each side believes about the plaintiff's qualifications. I assert that in such cases, evidence of qualifications presented by the defendant discriminators cannot substitute for a tenure review, that such information should be considered spoiled, and that summary judgment against the non-moving

38

party is not appropriate. In such a situation—wherein the material evidence is missing due to spoilage, the basis of a decision by a finder of fact reduces to one of credibility of the parties and witnesses. Determinations of credibility and truthfulness are the purview of juries, and not judges. Therefore, in such a case, summary judgment against the non-movant is not appropriate under the Federal Rules of Civil Procedure (FRCP). If summary judgment is rendered against the non-movant (plaintiff) in these cases, its rendering results in an unconstitutional denial of the plaintiff's right to a jury trial under the 7th amendment to the United States (U.S.) Constitution (Thomas Suja A 2007; Thomas Suja A 2008; Thomas Suja A 2012). Moreover, because the alleged assessment of the plaintiff as unqualified does not derive from a full and proper tenure review, finders of fact cannot be seen to sit as "super tenure committees". On the contrary, I would argue that by accepting evidence spoiled in this way, the court, in effect, would then truly sit as a "super tenure committee"--along with those who presented the tainted qualifications spoiled by racial discrimination.

38.     Although the "modern-day/silent" racism and discrimination of the defendants prevented Dr. Weathers from receiving a full and proper tenure review, Dr. Weathers can show that she was qualified for tenure in MCH by comparing her record to the best information that we have--evidence from the record of other faculty who were promoted and received tenure in MCH. Based upon this assessment, I assert that a reasonable finder of fact would conclude that Dr. Weathers was qualified for promotion and tenure both at the May 1, 2007 date—prior to which Dr. Peterson refused to consider her for promotion and tenure in MCH, and at the October 22, 2007 date--when the full professor were alleged to have reviewed her. The case of Dr. Halpern, the faculty member of record granted tenure just prior to Dr. Weathers, is telling and most helpful. Dr. Halpern is not a member of a protected class.

39.     First, I will establish Dr. Weathers' record. Over her assistant professor years, Dr. Weathers accrued 13 first authored scholarly articles: six (6) publications and 7 manuscripts either under peer review (2) or under development (5). Dr. Weathers was the lead author on all 13 publications and manuscripts. Dr. Weathers also achieved excellence in grants scholarship by: 1) establishing herself as a Principle Investigator (PI) on two, nationally competitive research grants [one as the sole PI and one as a Co-PI]; having submitted a third research grant, as the PI, for national competition at the National Institutes of Health (NIH); as well as working as a co-investigator on the team of grants with other researchers. Moreover, she was informed in June 2007 that she had received a very high fundable score as the PI for the competitive multi-state NIH study (about which she had received direct communication from NIH that she would be funded and for which she later was funded). Dr. Peterson was aware of this information at his June 2007 annual meeting with Dr. Weathers—i.e., prior to the "full professor's meeting" in October 2007. Dr. Weathers also established herself as a nationally recognized scholar in the health of immigrant children, as evidenced by: 1) her recommendation for membership to the National Advisory Committee on Migrant Health (NACMH), and her later selection as the nominee of the U.S. Health Resources Services Administration (HRSA) for this Council, 2) her invitation to serve as a grant reviewer for the federal government on national grant review committees, her membership on national advisory boards, and her presentation of research findings at national meetings in her field. A key component of Dr. Weathers' scholarship is the demonstration of independence as an investigator and the ability to form meaningful working collaborations with others (see Sastry, Irons, and E. Foster affidavits).

40.     In light of Dr. Halpern's record, it can be seen that the defendants were blatantly dishonest with the USDCNC, and misleading in their testimony regarding the basis upon which

faculty who are not members of protected classes have been promoted in MCH and the UNC

SPH, as well as the latitude available to faculty during the application submission and review

process within the SPH. The then interim chair of MCH—Dr. Kotch--recommended Dr. Halpern

to the Dean for promotion and tenure based upon excellence in research. The SPH APT review

of Dr. Halpern documents that the most important period for their review was the assistant

professor years. In fact, for Dr. Halpern's review, the SPH APT committee and the external

reviewers specifically focused on this time period. Over this time period it was noted that Dr.

Halpern had accrued a total of 13 or 14 scholarly articles [six (6) first authored publications, 1

collaborative publication, 5 collaborative manuscripts under review, and 1 first authored

manuscript under review for conditional acceptance]. It is obvious that although referred to

misleadingly as "publications" by the defendants, half were not published. Notably, the SPH

APT committee assessed Dr. Halpern's publications as modest but acceptable; however, because

Dr. Halpern's scholarship emanated largely "under the wing of" and from grants of her mentor,

lack of clarity regarding her independent role in grants, and lack of demonstration of a national

reputation, she was assessed as lacking independence as a researcher and therefore not

recommended for promotion and tenure. Here, it is important to note that the basis of concern by

the SPH APT committee regarding Dr. Halpern was not publication numbers, but rather the other

factors—lack of independence as an investigator, lack of clearly demonstrated leadership roles

on grants, and lack of evidence of a national reputation. Dr. Weathers did not lack these other

factors, and demonstrated full independence in authorship.

41.     In light of the SPH APT concern, Dr. Peterson came to Dr. Halpern's rescue at the

proverbial "11th hour". He advocated for him/her before the Dean, expressed his commitment to

support him/her, retroactively asked an outside referent to clarify and reissue his assessment to a

41

more supportive one, accepted new letters of support for Dr. Halpern internally from campus faculty—including her long-time mentor, retroactively added to her CV a list of collaborative manuscripts developed over the 6 plus months after submission of her promotion application— even after the SPH APT review, and then finally asked that she be reconsidered by the SPH APT committee. It is critical to note that these additions and the request for re-review came approximately 6 months after the originally scheduled SPH APT review and 7 months after Dr. Kotch's chair's letter to the Dean. Moreover, Dr. Peterson's letter to the Dean, requesting re-review, is dated one day prior to the date by which university guidelines state that faculty are to be told (a year in advance of their employment termination date) whether or not they will be reappointed and/or promoted ("decision date"). After Dr. Peterson resuscitates Dr. Halpern's bid for tenure, she is re-reviewed by the SPH APT committee nearly one month after her "decision date", and approximately 8 months after the Dean's deadline. In light of the new, modified, and non-external "reviews" by colleagues--as well as the added scholarship and grants accrued over those 7 plus months, Dr. Halpern was recommended for promotion by the SPH APT committee based upon excellence in research. A letter confirming the approval of the Board of Trustees for promotion and tenure was sent from Dr. Moeser approximately two and one-half months after Dr. Halpern's "decision date" had passed, and with an effective date three months after this "decision date". In other words, 21 years after her PhD was granted and despite a head start of approximately 15 years of research experience on Dr. Weathers, Dr. Weathers exhibited a stronger overall record of independence than did Dr. Halpern over the assistant professor years. Moreover, when her independence was questioned and Dr. Halpern's bid for tenure was challenged outside of the MCH, Dr. Peterson intervened on her behalf, options were pursued for him/her, and the promotion process timeline that was deemed as unmovable for Dr. Weathers

42

was slackened on a scale of several months for Dr. Halpern—even past her "decision date". This evidence directly contradicts Dr. Rimer's testimony indicating that the dates and timelines are fixed, and that in order to be fair across faculty, only material submitted or attained (grants, publications, appointments, awards, etc.) prior to the departmental deadline can be considered for review (see Dr. Rimer's affidavit). Tellingly, whereas Dr. Halpern was deemed to have exhibited excellence in research--despite her lack of independence as an investigator, Dr. Weathers—whose record is overwhelmingly independent, who had a similar number of scholarly articles overall during the assistant professor years, who was nationally recognized in her field, and who had a higher number of first authored articles—was deemed unqualified for promotion and tenure and was offered no options or interventions by the very faculty defendants who discriminated against her and yet supported Dr. Halpern.

42.     Moreover, review of the record shows that the departmental pre-application submission process as followed for other faculty faithfully tracks the MCHRP 1996. The case of Dr. Halpern is again exemplary. This record shows that a request letter from Dr. Kotch to one referent is dated 10/16/2003—a date more than three months before the January Dean's deadline. This suggests that the faculty member's referent names would have already been requested prior to this date—i.e., even earlier than 3 months prior to the Dean's deadline. Moreover, in his letter, Dr. Kotch requests that the recommendation be returned by November 10, 2003—a date more than two months before the Dean's deadline. The first return review letter is dated 10/31/2004; the last 11/18/2004. The record reveals that similar timelines were followed for other MCH faculty. In contrast, Dr. Peterson gives Dr. Weathers dates for name submission *beginning* approximately 21/2 to 2 months before the Dean's deadline. By this time, other faculty already had their letters back in the department, and referents had been allowed more

43

than a month to review the candidate. This evidence indicates that senior faculty in MCH—the defendants in this lawsuit—were aware of the procedures under MCHRP 1996, and yet neither followed them nor provided them to Dr. Weathers for her promotion process.

43.     The process applied to Dr. Halpern also is exemplary of the harm caused to Dr. Weathers by the discriminatory actions of Dr. Peterson and the MCH senior faculty. For by withholding the official documents and process from Dr. Weathers during her promotion application process, and then refusing to consider her for promotion and tenure based upon "deadlines" that were never communicated to her (Dr. Peterson's letter of April 4, 2007), Dr. Peterson and the MCH faculty effectively prevented Dr. Weathers from being able to exercise the options available during the tenure review process—even after the "decision date" –as was done for Dr. Halpern, who is not a member of a protected class. Because Dr. Peterson and the defendants were the very same people who argued that these options were not possible for Dr. Weathers—a member of a protected class, however, they applied them to Dr. Halpern—who is not a member of a protected class and who was promoted just prior to Dr. Weathers, their actions expose and belie their discrimination based upon race.

### *LIMITATIONS OF DEFENDANTS USE OF PUBLICATION STATISTICS*

44.     In addition to dishonesty regarding Dr. Weathers' true qualifications for tenure, as well as about previous faculty granted tenure, the defendants also used publication statistics to mislead the USDCNC with regards to Dr. Weathers' true qualifications for tenure. First, it is critical that finders of fact understand and appreciate the importance of the period of review as the assistant professor years. This is important because the summary publication numbers proffered by the defendants as "necessary" for promotion and tenure reflect the sum total of faculty publications over their entire careers—i.e., includes articles published before becoming an assistant professor

44

at UNC-CH. Moreover, these career publication summary totals at times blend together faculty members in departments other than MCH, where prior academic histories may differ and publication expectations and environments may differ.

45.     These points are important for three reasons. First, as mentioned earlier, the tenure committee process focuses on the work completed as an assistant professor under UNC-CH's "tenure clock". For many faculty members, research experience prior to the tenure clock amounts to from about 5 years to more than a decade of prior publications from jobs within academic and project-based graduate settings. Among many faculty in academic fields before coming to the School of Public Health, this time period can account for from about 6- 8 up to 18 or more publications. For faculty in fields outside of MCH, these numbers might even be higher upon entry as assistant professors. In light of this information, it is easy to see that with 6 publications as lead author as an assistant professor and the presentation of total career publications—rather than publications earned during the period of review, one could end up with totals of approximately 15 to 27 publications. The reality is that most assistant professors in MCH accrued 3 – 7 first author publications over the 6 year period of review. With other faculty including you as a collaborator on their publications (say 3), it is easy to see that even a faculty member who had 3 or 4 publications as a primary author during the assistant professor years would still total to 15 – 27 career publications. These numbers notwithstanding, the record of Dr. Halpern documents that the focus of the period of review is the assistant professor years—six for most faculty; independence in scholarship and research is the focus of the review; approximately six first authored publications during the period of review is common in MCH— although some faculty had fewer; and Dr. Weathers' total of 13 scholarly articles—all as first author—would have surpassed Dr. Halpern's total of 7 first authored articles over the period of

45

review, as well as surpassed the number of first authored articles during the assistant professors years of nearly all other MCH faculty granted tenure before 2007. Moreover, Dr. Halpern's publication number during the period of review, along with that of all other MCH faculty, reveals as untrue Dr. Peterson's statement that 5 - 6 published articles per year is the "norm" for faculty in MCH. It also reveals that Dr. Peterson's proffered publication "norm" sets a discriminatory bar for Dr. Weathers, as compared to other MCH faculty. In other words, the record of Dr. Halpern—the faculty member who received tenure in MCH just about two years prior to Dr. Weathers' process—provides evidence that the defendants were intentionally dishonest in their testimony to the USDCNC.

46. Second, an important characteristic of Dr. Weathers' background is that she was a clinician prior to coming to the School of Public Health. Her entry into academic public health represented a career move from clinical medicine, after additionally obtaining a doctorate in public health. Hence, in contrast with the defendants' assertions that she had published articles prior to becoming an assistant professor in MCH, the truth is that she had no peer reviewed publications—and had never submitted a manuscript for publication--prior to becoming an assistant professor at UNC-CH. Any unbiased tenure review committee would have recognized and considered this context in its review. Moreover, because the tenure review committee in the UNC SPH considers the period of review to be the assistant professor years under the UNC-CH "tenure clock", Dr. Weathers' background would not have been viewed as detracting from her qualifications or as a "deficiency". On the contrary, her background is strength for her field of study. However, we see a different attitude from the "review" by MCH professors. Again, the record of Dr. Halpern confirms the veracity of Dr. Weathers' assessments over those of the defendants.

46

47. Third, finders of fact now can clearly see the effect on publication numbers of being invited—or not invited-- by the manuscript's primary author to collaborate as a second or lower author. Again, the record of Dr. Halpern invalidates the defendants' testimony regarding the number of publications needed in order to be granted tenure, and validates the veracity of Dr. Weathers' testimony. However, the ensuing discussion is an effort to expose the defendants' misleading testimony to the USDCNC. Overall publication numbers can balloon depending upon your invitations from other, more senior and seasoned faculty and scientist: usually, the senior faculty in the department take a lead role in these invitations to more junior faculty. Herein, also can be seen the influence of "modern-day/silent" racism and discrimination on Dr. Weathers' publication numbers. In accounting for the effect of "modern-day/silent" racism and discrimination on her second and lower authored collaborative contributions, Dr. Weathers' comments are explanatory and not evaluative. That is, they are not stated as indictors of any lack of qualification on her part, but rather as explanations for why and how that path of collaboration was closed to her. Instead, the "modern-day/silent" racism and discrimination of her colleagues led to Dr. Weathers having to rely on her own individual effort in first authored publications, and the other acceptable means to demonstrate collaboration (see handbook)—which she pursued vigorously. Put another way, in countering the defendants misleading characterization of her scholarship as "deficient" as a result of no secondary or lower publication collaborative contributions, Dr. Weathers affirms that "modern-day/silent" racism and discrimination led to no secondary or lower collaborative invitations for her in publications; however, she strongly denies that the effect of "modern-day/silent" racism and discrimination results in her scholarship as "deficient" or makes her unqualified for promotion and tenure. Again, the record of Dr. Halpern confirms Dr. Weathers' assessment.

47

48. Whereas the record shows that most faculty seeking tenure in MCH were given about 3 to 15 slots to contribute as second or lower authors during the period of review, no faculty member in MCH—senior or otherwise, ever invited Dr. Weathers to contribute as a collaborative author, or ever responded affirmatively to Dr. Weathers' multiple requests to contribute her expertise as a collaborator to their publications. Moreover, unlike other faculty in the department—who had formal positions in other centers and departments and through which they were able to gain collaborators, Drs. Kotch and Peterson never acted upon Dr. Weathers' repeated requests to establish a joint position for her. They refused to act to secure other positions for her even after the chairman of the Department of Pediatrics at UNC Hospitals expressed interest in making such a joint position for Dr. Weathers. Despite non-collaboration from her departmental colleagues, and as can be seen above, Dr. Weathers collaborated with faculty largely outside of UNC-CH as a first (lead) author. In the light of the truth, it now can be seen that Dr. Weathers' secondary and lower contributing authorship outcome is purely the result of non-collaboration from her MCH colleagues: it is not an indicator of any reduction in her qualifications for tenure. That the defendants would offer their non-collaboration to indicate and characterize Dr. Weathers' as unqualified for tenure belies their discriminatory intent. Tellingly, the defendants never affirm that supporting authorship is a requirement for tenure. The defendants also never rebut Dr. Weathers' affirmations regarding:

1. the primacy of lead scholarship (grants and publications) as a requirement for tenure,

2. the importance of the assistant professor years as the relevant period of review,

3. her first authorship during the period of review--the assistant professor years--is higher than many MCH faculty who progressed in the department,

4. The acceptance under the faculty handbook of the varied ways in which scholarly collaboration can be demonstrated—i.e., supporting authorship is not a collaboration requirement.

5. Supporting authorship is not a requirement to be qualified for or granted tenure at UNC.

49. Tellingly, the defendants never state why not having second and lower collaborative authorship would make Dr. Weathers unqualified as a scientist (i.e., in her job) or for promotion and tenure. Notably, Justice Burger notes, in the Supreme Court decision of Briggs (1971), that:

> *"More than that, Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question."*

In the same opinion, he terminally notes that:

> *"What Congress has commanded is that any tests used must measure the person for the job and not the person in the abstract".*

In this case, although Dr. Weathers has demonstrated excellence in scholarship and collaboration as a lead author and investigator—having assumed oversight and implementation of all aspects of the research process on multiple occasions, the defendants are alleging that she is made unqualified because she was not offered supporting roles in manuscript development—the skills for which she has already demonstrated full competence as a published, lead author. In other words, these "requirements" are the very same skills that she already has actually competently used to perform her job, do not adversely affect faculty who are not members of a protected class when they seek promotion and tenure--even when they do not possess the "requirements", favor those not in protected classes, and clearly are being used discriminatorily against Dr. Weathers.

49

## LIMITATIONS OF QUANTITATIVE INDICATORS USED BY THE DEFENDANTS

50.     The defendants also misled the USDCNC with their assessment of Dr. Weathers as unqualified based upon quantitative publication numbers. The fundamental limitation of the statistics and data presented is that these factors can never indicate the basis upon which a tenure committee would have assessed Dr. Weathers or what decision would have resulted from the true tenure review process. A second key limitation of the defendants' use of summary publication statistics is they do not isolate the period of review to the assistant professor years; nor do they separate out first versus secondary and lower authorship. However, independent of these statistics, the record of Dr. Halpern proves the defendants to have been dishonest regarding what is acceptable for tenure. This discussion, then, is to expose to the court why the information presented to it by the defendants is misleading, and should not be believed.

51.     In addition to the fundamental limitation of the defendants' use of summary statistics (listed above), the failure of the defendants to provide publication data relevant to the period of review can lead finders of fact to err in the inferences that they subsequently make, as well as err in the judgment that they render. This can occur because a total-career summary publication number results from the contribution of publications as an assistant professor plus publications prior to becoming an assistant professor. In order to be minimally meaningful, the component relevant to the period of review should be clearly identified; however, the defendants did not make this identification. The reduced usefulness of overall, summary statistics becomes even more problematic when you account for first versus supporting authorship—where the faculty member's contribution is not ascertainable from the statistic itself, yet the publication is counted on par with first, lead authorship. Here again, the comments of the past chairman of the School of Public Health APT committee, Dr. Kilpatrick, are telling when he says that it is known that in

50

many cases junior faculty are given credit for a publication—even as first author—*when it is known that they did not do any work on the publication* (see 2010 Video deposition testimony of Kilpatrick). We highlight this comment not to indicate a similar desire for Dr. Weathers—as the defendants falsely allege, but to show that Dr. Weathers' excellence and independence in scholarship is being compared by the defendants to faculty scholarship that is known to be inflated by an entrenched, accepted, and ubiquitous practice of academic fraud within the SPH— and to which Dr. Weathers' independence in scholarship is then labeled by the defendants as "deficient". Dr. Kilpatrick's testimony also indicates that the SPH APT committee takes into consideration scholarly articles under development. Because of this and numerous other influences, a summary career publication number does not indicate intelligence, qualifications for tenure, or a faculty member's ability as a scientist (you could have played a minimal to no role on all or most of your collaborations). In fact, the APT manual specifically indicates that publication numbers are not the only indicator of excellence in scholarship. That the defendants have presented these statistics as absolute indicators of evidence of Dr. Weathers' qualifications for tenure—whilst fully aware of the many flaws that attend them, as well as the APT guidance regarding them—exposes their attempt to mislead the finder of fact in the USDCNC.

52.     The conceptual and presentation limitations inherent in overall summary statistics related to career publication numbers, as presented above, are further compromised by fundamental statistical limitations of the numbers presented. Following, I will discuss three key limitations. The first critical and obvious limitation to the quantitative data presented by the defendants is the well-known fact that averages and medians are aggregate measures of central tendency. As such, they neither indicate nor can be used to predict either the total publication number of a given, real individual or what number of articles is acceptable to a tenure committee. A second

fundamental, well-known limitation to the use of averages is they are properly applied to data that come from a normal distribution, rather than to skewed or ordinal data. Averages also are notoriously sensitive to extreme or skewed values—i.e., unusually high or low values. A total publication number is best described as a discrete, categorical, ordinal number; therefore, by its categorical, rather than continuous nature, it is ill summarized by averages. Notably, the defendants indicate a high level of variation in article numbers among and within departments--a tell-tale sign that their use of averages can give rise to improper inferences regarding the number of publications that any tenured faculty member had upon application for tenure. Medians are less sensitive to extreme values and better suited to ordinal data, like article numbers; however, used alone, they also can give rise to improper inferences regarding the most common values in a group, as well as the upper and lower values in a group. These facts notwithstanding, medians—as averages--cannot identify what is acceptable for tenure. The following EXAMPLE A is useful to explain this point:

> **EXAMPLE A.** Publication numbers for each tenured faculty member in
> DEPARTMENT X, which has 15 faculty: 12,12,12,12,12,12,12,25,26,27,27,27,27,27,40.
> The average, overall publication number for tenured faculty in DEPARTMENT X is 21.
> As can be seen, 21 publications is the average number for the department overall—or as a
> group; it is not the publication number for a specific person, as no tenured faculty
> member in DEPARTMENT X actually had 21 publications. The median number of
> publications is 25. As above, this is a departmental level statistic. While one person in
> DEPARTMENT X actually had this number of publications, the majority did not. In
> fact, several people (approximately half or 50%) who received tenure in DEPARTMENT

X actually had 12 publications—a number representing slightly less than half of the median publication number.

The limitations of measures of central tendency—such as averages and medians—as sole indicators of a specific faculty member's qualifications for tenure or even whether or not a faculty member received tenure are magnified when one begins to combine faculty publications numbers across departments to generate school wide averages.

53.     In summary then, the adage "Statistics do not lie, but you can lie with statistics" is appropriate for the defendants' testimony. The defendants' use of quantitative data indicating abstract summary statistics, at the aggregate level for the school and for departments, for publication numbers was heavily flawed, and was an attempt to mislead finders of fact regarding Dr. Weathers' qualifications for tenure. While the conceptual, presentation, and statistical limitations are many, two simple and common sense facts defeat the defendants' entire defense based upon measures of central tendency in career publication numbers. The first simple, common sense fact is that their statistics neither represent, nor can ever take the place of the review, assessment, and decision of tenure committees as derived through the tenure review process. The second is that according to the APT manual and past candidates granted tenure in the department, article numbers alone are neither sufficient nor are used as the sole basis for a tenure decision. In the face of the fundamental and known limitations to the use of summary statistics, the defendants' presentation of aggregated and career publication numbers to attempt to indicate that Dr. Weathers was unqualified for tenure was a deliberate attempt to mislead the USDCNC, so as to influence a decision by its finder of fact in the defendants' favor. In doing so, the defendants benefitted greatly from the historical deference granted to them by the courts, strengthened their deference by defrauding the court, and thereby enhanced the probabilities that

they would be believed and that their testimony would be accepted by the USDCNC over that of Dr. Weathers.

## EFFECT OF FRAUD ON THE DECISION OF THE USDCNC

54.    Dr. Weathers asserts that the fraudulent actions of the defendants functioned to compromise the ability of the finder of fact in the USDCNC to accurately and fairly apply the McDonnell Douglas test framework to her case. Moreover, Dr. Weathers believes—and raises for consideration by this court—that the fraudulent actions of the defendants ultimately resulted in an improper decision in favor of the defendants. As can be concluded from this discussion, the defendants' dishonest testimony systematically compromised the USDCNC's ability to draw proper conclusions regarding three of the four prongs of the McDonnell Douglass framework. By defrauding the court--by withholding from the court the very evidence that could prove their discrimination, and then simultaneously testifying to that same court against proof of said evidence and in favor of their treatment of Dr. Weathers as equal to that of other faculty in the department seeking tenure, the defendants manipulated the USDCNC towards a conclusion that racial discrimination was not a factor in Dr. Weathers' application process for tenure. This was a huge, ill-gotten gain for the defendants; for with it, the court was primed to conclude that Dr. Weathers did not apply for tenure, and was poised to believe the defendants' later and false testimonies alleging both their extraordinary support of Dr. Weathers, and their assessment that she was not qualified for tenure. Further, a finding of non-discrimination in the promotion application process for tenure, along with the court's desire not to sit as a "super tenure committee", and combined with the historical deference awarded by the courts to universities for decisions regarding qualifications for tenure, all interacted to tip the balance of the USDCNC towards concluding that Dr. Weathers was not rejected under circumstances giving rise to an

54

inference of unlawful discrimination. In other words, absent evidence exposing "modern-day/silent" racism and discrimination, the defendants were able to defraud the court in order to strengthen the architecture of support for them under the McDonnell Douglass framework and assure a summary judgment against Dr. Weathers.

55.     Now in the light of the truth, it can be seen that racial discrimination influenced all aspects of Dr. Weathers' application development and submission process, as well as influenced the negative evaluation of her qualifications for tenure by the defendants. This discriminatory influence included, but is not limited to: 1) the defendants dishonesty to the court regarding racial discrimination in Dr. Weathers' application process for tenure, 2) the timing of Dr. Weathers' submission of her promotion materials, 3) the defendants refusal to review the application package that Dr. Weathers did submit—and which was sufficient for a review for recommendation of tenure, and 4) the false determination by the defendants that Dr. Weathers was unqualified for tenure. Moreover, Dr. Weathers asserts that she did apply for and was qualified for promotion and tenure in MCH. In addition, Dr. Halpern's record shows that Dr. Peterson, the MCH faculty defendants, and Dr. Rimer were not truthful with the USDCNC regarding the time allowable for acceptance of a tenure candidates materials for review.

56.     Dr. Weathers asserts that the documents withheld from the court by the defendants, in an effort to defraud the court, are material evidence—as their production would have affected the outcome of the case. She further asserts that these documents raise a genuine dispute as to the facts of this case because, with the benefit of their information and implications—as well as the benefit of awareness of the dishonesty of the defendants in defrauding the USDCNC--finders of fact in a fair hearing and in a trial could reasonably find in favor of Dr. Weathers. Moreover, the Supreme Court ruling in Griggs (1971) is relevant here. In addressing the need for tests and

55

requirements for employment and/or qualifications for advancement to be non-discriminatory and to be directly relevant to the employee's ability to actually perform his or her job, Justice Burger writes (Act refers to Title VII of the Civil Rights Act 1964) [I inserted the underline for emphasis]:

*"Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze" the status quo of prior discriminatory employment practices."*

*"Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification."*

*"Congress has now provided that tests or criteria for employment or promotion may not provide equality of opportunity merely in the sense of the fabled offer of milk to the stork and the fox. On the contrary, Congress has now required that the posture and condition of the job-seeker be taken into account. It has—to resort again to the fable—provided that the vessel in which the milk is proffered be one all seekers can use. The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited."*

*"The Court of Appeals held that the Company had adopted the diploma and test requirements without any "intention to discriminate against Negro employees." 420 F. 2d, at 1232. We do not suggest that either the District Court or the Court of Appeals erred in examining the employer's intent; but good intent or absence of discriminatory intent does not*

56

*redeem employment procedures or testing mechanisms that operate as "built-in headwinds" for*

*minority groups and are unrelated to measuring job capability."*

"*The Company's lack of discriminatory intent is suggested by special efforts to help the*

*undereducated employees through Company financing of two-thirds the cost of tuition for high*

*school training. But Congress directed the thrust of the Act to the consequences of employment*

*practices, not simply the motivation. More than that, Congress has placed on the employer the*

*burden of showing that any given requirement must have a manifest relationship to the*

*employment in question."*

"*The facts of this case demonstrate the inadequacy of broad and general testing devices*

*as well as the infirmity of using diplomas or degrees as fixed measures of capability. History is*

*filled with examples of men and women who rendered highly effective performance without the*

*conventional badges of accomplishment in terms of certificates, diplomas, or degrees. Diplomas*

*and tests are useful servants, but Congress has mandated the commonsense proposition that they*

*are not to become masters of reality."*

"*Nothing in the Act precludes the use of testing or measuring procedures; obviously they*

*are useful. What Congress has forbidden is giving these devices and mechanisms controlling*

*force unless they are demonstrably a reasonable measure of job performance. Congress has not*

*commanded that the less qualified be preferred over the better qualified simply because of*

*minority origins. Far from disparaging job qualifications as such, Congress has made such*

*qualifications the controlling factor, so that race, religion, nationality, and sex become*

*irrelevant. What Congress has commanded is that any tests used must measure the person for the*

*job and not the person in the abstract."*

57.    I argue that Dr. Weathers' case is a faithful example of the reasons for which the

protections that Congress intended under Title VII are needed and remain relevant in the 21st

century.  For even though her individual scholarship over her assistant professor years

demonstrates collaboration and is commensurate with to better than that attained by all tenured

MCH faculty during their assistant professor years—indicating her ability to perform her job

with excellence, the defendants assess her as unqualified because they did not invite her to

comment in and contribute to their scholarly articles.  In other words, irrespective of her own

demonstration of excellence in her job, she is labeled as unqualified because of others' lack of

action with regards to her.  Here we see the fundamental importance and the relevance of Justice

Burger's comments, reminding us of the necessity that: "*the vessel in which the milk is proffered

be one all seekers can use*", and "*More than that, Congress has placed on the employer the

burden of showing that any given requirement must have a manifest relationship to the

employment in question.*"

58.    I believe that the nature of the fraud committed by the defendants reveals a disregard for

the integrity of the judicial process.  Moreover, I believe that the manner in which the fraud was

committed further exposes the defendants' casual lack of respect for the historically rooted trust

and deference awarded to universities by the judicial system, as well as a savvy insight into how

to circumvent fair scrutiny by the courts.  That this fraud was committed at all, and the ease with

which it was committed should give all people of good and fair conscious pause and concern.

Further, this compromise of the fair meting out of justice should be a wakeup call to the entire

judicial system, and to all who seek and are entrusted with the administration of justice, as to

how easily their analyses can be compromised by "modern-day/silent" forms of racism, when

coupled with fraud.  For if justice can be compromised this easily and openly--and yet remain

without effective and restorative remedy once exposed--then those categorized in the U.S. as "protected groups" effectively have no refuge in the law against discrimination in academic settings. Moreover, rather than stand as beacons to constantly reinforce the commitment and promise of our society's rejection of discrimination based upon race—as codified in our laws (Title VII), the courts can be easily compromised by fraud, and are thereby manipulated by the academy as part and parcel of the machinery and the process of discrimination within it.

## VI. RELIEF

59.  I humbly ask that the court remove from the defendants the deference with which they have been bestowed, and find that, in light of their fraudulent withholding of and tampering with evidence, the weight of the favor of the evidence under the McDonnell Douglas framework shifts to Dr. Weathers. In the face of this attempt by the defendants to defraud the court, I ask that USDCNC vacate its ruling of summary judgment in their favor, and permit Dr. Weathers to exercise her right to a trial by jury—as guaranteed to her under the 7th amendment of the U.S. Constitution. The fact that the defendants chose to defraud the court even though they enjoyed the comfort and relative safety of its attitude of deference towards them, should raise numerous warning flags to finders of fact regarding the veracity of the remaining aspects of their testimony, and the motives behind their decision to risk undermining the integrity of the judicial decision making process. For if we are earnest in our desire for equal treatment of persons under the law, and in our belief in the promise of non-discrimination under Title VII of the Civil Rights act, then we recognize that each one of us has a stake in making sure that racial discrimination is not allowed to corrode and constrain and destroy the opportunities of members of protected classes within our society. With this recognition, we then understand that each one of us must remain vigilant of those elements in our society that do corrode, constrain, and destroy the liberties and

59

protections afforded by our laws. Vigilance of freedom is the inheritance of a free society. And I believe that eternal vigilance is the inheritance of a society such as ours—with a history of racial discrimination, yet with a codified desire to rid itself of discrimination and its corrosive effects. Therefore, eternal vigilance against racial discrimination is the responsibility and the inheritance of every American—irrespective of race, ethnicity, gender, national origin, geographic location in the U.S, religion, or creed. No American can change our country's history, but through vigilance and action we each can shape a better future for our country. No institution's individual interests should be deemed more important than, or placed above this general, greater, constitutional, and perpetual interest of our society. Nor should any institution be allowed to escape the mechanisms that our society has in place for vigilance against discrimination, and relief under Title VII.

60.     In order to be vigilant against discrimination in our society, we must allow individuals to exercise their 7th amendment Constitutional right to have their Title VII claims investigated and scrutinized by jury trials in our courts of law. In order to make proper decisions regarding claims submitted, those in institutions that are entrusted with the ability and the authority to investigate claims of discrimination must remain up-to-date and relevant regarding the changing nature of discrimination. Dr. Weathers' case is a faithful example of this need. Whereas in earlier decades, racial discrimination was more often overtly and openly practiced, today, the vanguard of racial discrimination is "modern-day/silent" racism and discrimination—*"practices that are fair in form, but discriminatory in operation."* Silent and subtle forms of racial discrimination are highly effective, but often are more difficult to prove than are the overt forms they often coexist with or replace. Moreover, the very nature of academic institutions—as closed systems that are largely left to self-regulate, and to whom much deference is allowed by the courts—

makes these institutions, I believe, among the most successful havens of "modern-day/silent" racism and discrimination in our society today.

61.     The commission of these acts of fraud by the defendants has called me to the action spelled out in my complaint under Rules 60 (d) and 60 (b) (6) of the FRCP. Specifically, I desire to be allowed to exercise my Constitutional right to a trial by jury, as afforded under the 7th amendment to the U.S. Constitution. In light of the fraud on the court carried out by the defendants, to refuse me a trial now is a violation of that Constitutional right allowed me. Because the fraudulent actions of the defendants involve evidence that is material to my case and that raises a genuine dispute of the material facts of the case, to deny me a trial now—in the face of their fraud—touches upon the honor and the dignity of this court. Moreover, this remedy can help others, by exposing how and how easily academic institutions can execute and hide silent and subtle forms of racial discrimination against members of protected classes. This remedy also can help the justice system to better understand how fraud on its courts can slip past finders of fact and compromise the integrity and the fairness of the judicial process and its decision making.

62.     In presenting this complaint to the USDCNC, I am simply asking to be allowed a fair chance to oppose the defendants in court and on a playing field based in the truth—rather than one tilted unfairly in their favor by fraud and dishonesty. By this complaint, I humbly approach this honorable court. As a result of the Defendants' intentional fraud upon the court and evidence of employment discrimination, I ask this Court's indulgence for at least the following relief—WHEREFORE, Plaintiff respectfully requests the following relief from this Court:

1.  Vacate the earlier summary judgment decision and order of the USDCNC that were in favor of the defendants in case 1:08-CV-00847;

2. Issue a ruling allowing the Plaintiff to exercise her right under the seventh (7th) amendment to the U.S. Constitution to proceed forthwith to <u>try her claims from her prior case [1:08-CV-00847] before a jury</u> in a duly established federal court of law;

3. Issue <u>injunctive relief</u> to the Plaintiff by reinstating her in her former position at the UNC Gillings School of Global Public Health, pending the outcome of a jury trial; and

4. Grant such <u>other and further relief</u> as it deems just and proper, pending jury trial.


## JURY DEMAND

Plaintiff hereby requests a trial by jury on all claims so triable.


Respectfully submitted, this the 24[st] day of September, 2012.

**Plaintiff**

By:   *[signature]*

ANDREA WEATHERS

105 Scottingham Lane

Morrisville, North Carolina 27560

Home Telephone: 919.465.2411